The next case is 124454, Agenda No. 12, Ammons v. Canadian National Railway, Wisconsin Central, et al. If you are ready, you may proceed. On your honors, Justice Carminer, I'm Kevin Ford on behalf of Wisconsin Central, along with Joanne Fiskel. I bring to you a much less complicated case. It's a pure question of law. That question of law is, in 1908, when Congress enacted the FALA statute, did they, at that time, expressly or implicitly intend to bar, to preempt and bar, state law actions for property damage when a party brings a FDIC action? I think the answer is clear in the very simple, short statute that you have to consider. You also have, as I will discuss further, the benefit of four U.S. Courts of Appeals who have rendered a judgment on this very question and have determined that, under federal law, that the Congress did not intend to preempt state law and bar all counterclaims by railroads against employees who damage their property. This dispute comes to you without much of a record. There is no testimony or evidence whatsoever as to how or why Wisconsin Central decided to bring a counterclaim. The only question before you is, do they have the right to do so? The events that gave rise to the case is the two plaintiffs, named Riley and Eamons, one an engineer, the other a conductor on a train, according to the allegations of Wisconsin Central's complaint, drove the train, violated a number of safety rules like speeding, going through stop signs and caution signs, and doing considerable damage to Wisconsin Central's property. If we stop there, no one disputes that Wisconsin Central could have sued those employees for the damage to their property. Any employer in Illinois, or practically anywhere else as far as I know, can bring an action against an employee for damaging company property. But Eamons and Riley filed an FVLA case, and when the counterclaim by Wisconsin Central was filed, and it should have come as a direct claim as I had mentioned, but Eamons and Riley had filed their claims first, their defense to the counterclaim was, because we filed an FVLA case, we are absolutely immune from any property damage claims. The circuit court agreed with them, said that statute basically gives the employee immunity for the property damage. The case then came to the appellate court. We rather confidently appeared in the appellate court and decided for U.S. Court of Appeals decisions, all of which were considered carefully by a well-intentioned, a well-written appeal by Justice Griffin, joined in by Justice Pickford, an excellent panel all the way around. And it was also, we also have a very well-reasoned dissent from Justice Pierce. And they rejected the reasoning of these four U.S. Court of Appeals decisions, interpreting federal law, and determined that going along with dissents in the U.S. Court of Appeals cases, there are, in the four cases, there are two dissents. That meant, and the reason we were so confident, that meant that three courts of appeals, from Boston to the Eighth Circuit, spread all over the country, all agreed that the Congress did not preempt the right to file a counterclaim when it adopted the FVLA. That, by the way, constituted ten judges rendering their judgment when you take out the two dissenters. One of those judges happened to be Stephen Breyer, which is, I think, of some significance. And he sat on the first circuit court of appeals. But in other words, we had some considerable judgment of federal judges determining what was intended by federal statute. We think, we think they are correct for a number of reasons. And those circuits covered 19 different states, so cases tried in 19 different states are going to be tried along those rules. This court, and every court, admonishes that when you're trying to determine legislative intent, from the beginning to the end, read the statute. It's nice to speculate about why this or why that, and consider some of your own policy views on things. But generally, the exercise should begin and end by reading the statute. This statute says, provides that it will bar any contract, rule, regulation, or device whatsoever that has the effect that allows the railroad to exempt itself from liability. Now, the first few words, contract rule, the way that should properly be read, applying the canons of construction, applying common accepted grammar. Any contract, rule, regulation, or similar device. And I say that because you have contract, rule, regulation. You have three specifics followed by a general. The common rule accepted by this court is that when you have specifics itemized, followed by a general, then the general must be read along with the specifics. So that's the first. That policy was ignored by the majority below. It was ignored by the dissenting opinions in the federal cases. The second aspect of the definition, and what we're arguing about here, all of these briefs are just, what did they mean when they said device whatsoever? What did Congress mean when they said device whatsoever? Did they mean, did that intend to bar a counterclaim? And as I just demonstrated, contract rule, regulation, or a similar device can't be read to bar counterclaims. Because a counterclaim, contrary to a comment that Judge Posner made in his decision, a contract is not at all similar to a counterclaim and vice versa. The other, the remainder of the provision is in determining what is meant by device, is the device must allow the railroad to exempt itself from liability. Now, there is nothing in bringing a counterclaim or a separate complaint against an employee that exempts the railroad from liability under the FVLA. The FVLA case goes forward. They may be tried together. They may be tried in different states. But the FVLA goes forward. There is no exemption to the railroad. If the railroad loses, they are fully liable on the FVLA case. So that, there is no way, we respectfully submit, to read that provision of the FVLA to bar a counterclaim for property damage by the railroad. I would add the thought that, first of all, the very limited legislative history for this statute tells us that what Congress was concerned about was these contracts, rules, regulations that the railroads at that time had adopted, whereas, for example, if you went to work for a railroad, you had to sign an agreement that you would never bring a claim against the railroad, et cetera, et cetera, that they weren't liable for their fellow servants' negligence, et cetera. So it was clear that what they're getting at was contracts, rules, regulations, not counterclaims. A contrary reading causes, just doesn't make sense, as the dissent in this case points out. This is dissent below. If you had two people on the train, as you had here, Riley and Amons, if one was hurt and filed an FVLA claim, and you say he's exempt, therefore, from any liability for property damage, Amons would be fully liable on the principles that I stated earlier. Does that make sense? All of the dissents in the law review article that's relied upon, they say that if it arises, they use the language, if it arises out of the same occurrence, in other words, the property damage claim, to get the exemption, the property damage claim has to arise out of the same occurrence. Well, let's suppose Riley and Amons walked away from this train completely unharmed, and Riley tripped in the yard and hurt his ankle the next day. He'd file an FVLA case for that injury. He'd still be fully liable, according to the theories of the dissenters, as I read them, he'd still be fully liable under those circumstances for the damage to the train the day before. So it wouldn't solve what you're trying to resolve, what you're arguing here. If Congress did, and my friend Ms. Rosen is going to tell you that when Congress adopted the FVLA, they intended to knock down every single barrier there is to recovery, and that's how they get at the counter claims. If so, why did they leave in comparative negligence? This statute has been, this aspect of the statute has been debated for 35 years or more now, starting with the Kavanaugh case, and it's been written about in a number of articles. Congress hasn't said a word. If Congress really intended this statute to prevent counter claims, they would have said so by now, I would think. There's another aspect, pardon me, that you have to keep in mind. When I mention these four U.S. Court of Appeals decisions, and there's a terrific opinion, by the way, that came out, terrific in the sense that it's really well done. Of course, I say that because it agrees with us. Judge Caldwell, a district judge in Kentucky, recited it in our brief. It's Norfolk Southern versus Tilburg. She really nails it, but she brings out that point as well as the Nordberg case. But my point on that is that Kentucky joins the districts where this is going to be the law. So you have at least 20 states where this is going to be the law. One of the goals when you're interpreting a federal statute, as you have written before, is to have uniformity. It shouldn't be that a FVLA plaintiff in Kentucky is operating under different law than a litigant in Wyoming or somewhere else. And so the same law ought to apply in Boston as in Omaha. And that's the concept of uniformity. I'm not sure with this decision perhaps an Illinois case might, as things stand now, would be tried under different law. And it's your task to correct that. And so I would respectfully ask that you should read the statute, use those canons of construction, what motivates the railroad, and when you read the majority opinion below, they agree with practically everything said in those four U.S. Court of Appeals decisions, but they're just doing this because they filed an FVLA case. And I respectfully say that's not your concern. We don't know. There is nothing in this record as to the motivation of the railroad. And that's not your job. Your job is to determine what that statute means. And so I close by saying what motivates the railroad to file the counterclaim is not a question before you. The question before you is a very simple one. Did Congress, by implication, take away their power to do so? By implication, did they take away the power of the railroad to file a property damage claim only in cases where an employee files an FVLA case? I thank you for your attention. And unless there's a question, thank you very much. Seeing none, thank you. Counsel? Good morning. May it please the Court? Good morning, counsel. I'm kind of surprised by this argument this morning because there was no mention by my opposing counsel of the Deering case, which is the case that brings us here, really. Counsel, Mr. Ford acts as though there's, like, uniformity in the federal courts. And it's not true. Absolutely not true. Excuse me. Did you identify yourself? Oh, I'm sorry. Did I not? Leslie Rosen. I don't think so. I'm sorry. I'm so sorry. I'm Leslie Rosen here for the employees, Mr. Ammons and Mr. Riley. Thank you. I apologize. So I'm here to convince you. My job is to convince you to affirm. And on the basis of that is that there is no uniformity in the federal courts and that based on that lack of uniformity under State Bank versus State Bank of Cherry, you're to consider the better-reasoned decisions. My first question before I get to why Deering is the better-reasoned decision over Kavanaugh and its progeny is why should you even decide this case instead of not just punting, basically, and saying, like Mr. Ford said, Congress should decide. If Congress hasn't done this, why should we? And there's an answer to that. And it's mentioned in my brief and in the ITLA brief, the amicus brief. It's Kiernan versus American dredging. Counsel, may I ask you, you said there's not agreement in the federal court. Are there any other U.S. Court of Appeals decisions in this case going the other way? Deering is number one, and that's the Seventh Circuit. And that's a district case, right? No. That's the Seventh Circuit. I'm sorry. Deering affirms the Seventh Circuit cases from Southern Illinois, and there are new Southern District Illinois cases that also go with Deering. There's also in the Deering court, they mention another Jones Act case from the Ninth Circuit that goes along with this. But I want to go back, if that's okay, to why you should decide this case instead of just saying, we're going to wait for Congress, which, as a practical matter, waiting for Congress could be forever, and having nothing to do with the FDLA. But the Kiernan versus American dredging case is a great case, and that explains why Congress doesn't have to act at all. And that's the 1958 United States Supreme Court, authored by Justice Brennan. And it says that instead of a detailed statute codifying common law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of fashioning remedies for injured employees in a manner analogous to the development of tort remedies and common law. So based on that decision alone, there's no reason to defer to Congress or wait for Congress. And I think that's a major thing. To say that Congress hasn't said a word in the brief, they say that speaks volumes. It's just I don't believe that's true. So the other question is, why should you even consider Deering, especially since Mr. Ford doesn't even acknowledge it? Deering is from the Seventh Circuit. It actually has a slightly more narrow holding. In Deering, that was under the Jones Act. The Jones Act was enacted in 1920, and it incorporates the FDLA. It incorporates the two statutes that are at issue here, Section 55 and Section 60 of the FDLA. And in that case, a seaman was on a tow. He was injured, and the tow that he was working on sunk. He filed a suit under the Jones Act, and the vessel owner filed a special provision in the Jones Act that says that the owner can invoke the limitation of liability as the value of the vessel. And based on that, based on that limitation, the Seventh Circuit held in a unanimous opinion by Judge Posner, and it was agreed with by Judge Williams and Judge Kaney, that Section 55 barred that counterclaim for property damage for sinking of the tow. Ms. Rosen, you mentioned Section 55 and 60 of the Act. What does the term whatsoever mean? That's the core issue here. And by the way, if you didn't catch it, Mr. Ford kept saying similar. The question is any device whatsoever. And there's no definition for that. If there was a definition in the statute, we wouldn't be here. So what do we do? Based on your case of two years ago, Corbett v. Lake County, you go to see if there's a definition from the time that the statute was enacted. That's 1908 when Congress enacted this very liberal and humanitarian statute. Going to 1908, you can see we have a Supreme Court case that has a very similar definition of a similar issue. It is any device whatever, not whatsoever. I think that distinction is of no importance. And in that case, it was any means, all means and methods or that which is devised or formed by design, a contrivance, an invention, a project, et cetera. That was the Arbor v. Arbor packing v. United States, 209 U.S., 56 and page 71. And that was also a case involving railroad where some of the defendants were trying to sneak in lower rates. And that was not allowed by the Elkins Act. So they said, what does it mean? And they said, this is a contrivance. This is a contrivance. And to say that that's what it means. It means any device whatsoever means any way you're trying to exempt yourself from liability. And, in fact, it's very much an issue, what is the purpose of this counterclaim? It is purely to exempt from liability. There is no other basis. And when you go to Deering, now I'm going to go to the substance of Deering, that shows that is a very well-reasoned opinion. And it says, of course, it's a catch-all phrase, any device whatsoever, even in modern parlance, as my kids would say, whatever, whatsoever, any device whatsoever is a catch-all phrase, as Judge Posner said, and it means any opportunity to exempt yourself from liability. Because that is the only reason to file a counterclaim. While it was true that prior to the enactment of the FELA, railroads, like other employers, did have a right to file claims against their employees for contribution. No, there was no contribution until the 80s. But for property damage. We're talking about this case. In this case. Contribution. Here is a claim for contribution and property damage. There were two counterclaims. But they don't. But they never file them because these are people who are judgment-proof, typically, or they certainly can't afford to repair a locomotive. Ms. Rosen, is any counterclaim considered to be an exemption from liability? Any counterclaim. Honestly, I haven't thought about that. But we're talking about a counterclaim for property damages. I can't imagine what kind of counterclaim might be okay. But I honestly haven't given it any thought. We're talking property damages. And property damages is purely an attempt to chill the FELA right. This is a broad humanitarian statute. In 1908, nobody was thinking about counterclaims for property damage. I understand what you mentioned, what the motivation is here. But if you're correct, then a railroad can never recover for property damage caused by one of their employees, even if the employee is 100% negligent and the railroad is 0% negligent, as long as the plaintiffs file a FELA claim. Would that be your position? That would be my position. And it would be my position in dependence, actually, of the FELA claim under state law, which is a separate reason that you should affirm the lower court. Because the reason that employers never sue their employees, I doubt any of you have seen any cases where an employee is sued for property damage as a counterclaim in any tort case or any workers' comp case ever, is because they're being countered. The counterclaim here is for negligence. And the employer is liable for the employee's negligence. And the employee has no money, typically, to pay, especially in this case where we're talking about repair to a track or to a locomotive. Your opponent cited an example where there are two employees and one's injured and the other one is not, and the employer can sue the uninjured one for negligence or for damage. I don't think that's right. But he's barred if the injured one files an FELA case. How do you respond to that? I just responded to Justice Thomas. I don't think that's accurate. I don't think that's true. You've never seen such a case, first of all. And it is not true because if the employee is just negligent, then the employer is liable. If the employer were alleging willful and wanton conduct, that would be another story because that would be outside the scope of employment. But in the employment perspective, there's no liability. That's why you've never seen it. You're never going to see it. And that's all there is to it. So why is Kavanaugh? May I move on to Kavanaugh, why that's poorly reasoned or not as well reasoned? Okay. Kavanaugh is 1984. In 1984, we had a different legal landscape. You may recall we had contributory negligence was the law there. And we came on to comparative negligence in Illinois in the mid-'80s with Elvis versus Rebar. I don't know exactly what year that was, Elvis, because I couldn't log into my computer until after that. I'm sorry. But before you had comparative negligence, and that was pure comparative negligence, you had contributory negligence. So with contributory negligence, let's say there's a case and the employer files a counterclaim for property damages. The employer railroad is 1% at fault. The counterclaim is gone. It's history. It's gone. And in a case like that in 1984, what Kavanaugh has decided, Kavanaugh was based on a 1969 case from Kentucky. It's mentioned in footnote three of the opinion. And it wasn't such a big deal. It was not so relevant because there weren't going to be counterclaims because typically you could find that the railroad was 1% at fault and could buy counterclaim. But we don't have that anymore. So that's the first reason why Kavanaugh got so well decided in today's world. And second, of course, it's a split decision, and it relied on unpublished decisions, and it basically ignores the broad remedial purpose of the FVLA. You know, the FVLA is the first significant safety statute in the United States. It predates workers' compensation law. It is a tremendous important statute because prior to that, the inaction of the FVLA, 300,000 people a year, almost 300,000 people, railroad people had died in 1908 alone. It was a common occurrence that the railroads were being built, that it was so dangerous, and it's still dangerous. Trains are big. They're heavy. They're out of track, and they are expensive. Although the record is undeveloped because this was a motion to dismiss, you can take judicial notice of the fact that locomotives are expensive, and in this case, they're asking for a million dollars. You began your argument today saying during cases of better reason and that there's no uniformity. Yes. Mr. Ford indicated there are four Circuit Court of Appeals decisions. Yes. And I think in his reply brief, he says Blanchard recognized that Deering was only instructed because Deering expressly stated that it was not reaching the issue. Would you address that? Yes. First of all, it's judicial dicta to start out with, which I meant to get to, and judicial dicta is defined by this court in Case v. Cates, and it means that if a court has to analyze an issue to reach its decision, that it's judicial dicta. It's not just open or dicta where you can take it or leave it. And in this case, it should be undisputed that it's judicial dicta. Judge Posner analyzed Section 55 in the history of the FBLA very carefully because 55 applies to the Jones Act. And the only limitation on the Deering decision, the only distinction between Deering and the other circuit court cases, is that Judge Posner decided to make it a little kind of cute and say, well, we're only going to hold here that 55 applies when the defendant vessel owner invokes its right to limitation of the cost of the vessel. But otherwise, Deering thoroughly and most thoroughly of any of the decisions does analyze Section 55, and it's absolutely out of point in it, and it's instructive, and it should be taken as the – it should be considered very seriously. Also, I mean, interestingly, Mr. Ford said, well, you know, the first district case, that was – Stephen Breyer was on that. Well, yes, Stephen Breyer was on that, but we're not talking about any slouch on the Seventh Circuit. We're talking about Judge Richard Posner, who's one of the leading intellectuals, lawyers, and judges of our century. And that's a serious reason to pay attention to. Also, I didn't put in my briefs, but in rereading the Deering decision, I note that Deering relies also on California Home Brands, Inc. versus Ferrea. It's in the Deering decision, and I happened to read it recently. It is from 1989. It's also a Jones Act case, but it specifically also says, no counterclaims under Section 55. So we have that. Have I answered your question, Justice Gilbride? Oh, Justice Skarma. Oh, sorry. That's my question. Justice Skarma. Oh, I'm sorry. I meant that. Yes, I'm so sorry. Did I answer your question? Yes. Okay. I think that Judge Posner and Deering, his approach, generally his approach, is a very common sense and realistic approach. I mean, you could say, oh, it's not your job to think about the motivation. We don't know why the railroad filed this counterclaim. That's not your job. I disagree, and I think Judge Posner got that quite right. There's only one reason to file the counterclaim. Put the screws to the plate, if that's all there is to it. So what it is, I mean, so there are other reasons, other arguments that defendants made in this brief that I just want to address very briefly. There are other arguments. One, they say, well, you know, if you go this way, defendants file bogus lawsuits just to get the FDLA in so they don't have to, you know, respond to damages. That's, I think, absolutely unfounded. You can't find a lawyer to take an FDLA case that doesn't have merits. It's an expensive proposition, and it's unethical, and it's not going to happen. Second, they also say, I love it. Ms. Rosen, before your time is up, I just wanted to give you and then Mr. Ford a chance to talk about the legal scholarship of this court. I mean, Breyer, Posner. I know this court will not punt on this and say they're going to defer the captures because this court wants to attack it. This case, actually, is one of the most important cases I've ever argued because it has national import. This is a case that could, unfortunately, go to the United States Supreme Court because there is a conflict in the circuits. There is the Seventh Circuit. There's the Ninth Circuit case, and then there's these other older cases, and Deering is the newest case. So I would like, it's very important to really get this right. And get it right for two reasons. The device whatsoever, any device whatsoever includes every sneaky method you can come up with to exempt yourself from liability. Also, because under state law, they'd be just suing themselves, which just makes it a fail-suit. Two more little points. They say that if you go the other way, people will flock to Illinois to file lawsuits. That's absolutely untrue. In 2017, the United States Supreme Court decided BNSF versus Tyrell, which limited general jurisdiction against railroads. You could always sue a railroad if the injury didn't occur here. If the railroad is incorporated here or has its principal place of business here. It used to be, of course, when we were younger that lawsuits would all get filed in Madison County because the railroad had tracks there, but those days are gone forever. Nobody's flocking to Illinois to file a suit against a railroad or anybody else. So that's ridiculous. And finally, a rehearsal would cause forum shopping within the state because the Seventh Circuit, the district courts are following the Seventh Circuit, are not allowing counterclaims. So if you allow counterclaims in the state court, you're going to really be sending all the FBLA cases to the federal courts, which will be depriving the plaintiff of his or her right to pick the venue, and you're going to have absolutely crazy jury instructions in cases because we don't have pure comparative negligence in Illinois. We have modified comparative negligence. So you're going to have one set of jury instructions for the FBLA case and a separate one for the property damage case that are discrepant, and I think that will be chaos. So if you have no further questions, that's it. Thank you very much. Thank you. Counsel, reply. To address Justice Thomas' question, I know, I've known Justice Posner. I've known Justice Breyer. Posner, this paraphrases an old political campaign. Posner is no Breyer. And neither one is a match for this court. And now, to get to the subject at hand, we didn't ignore the urine case. We discussed it in our brief. I don't care whether it's considered a judicial victim or something else. You can compare the reasoning of Judge Posner in that case with the reasoning of the courts in the U.S. Court of Appeals, decisions that we're relying on, and make your determination as to which one makes the most sense. And, again, I would urge that you read Chief Judge Caldwell's opinion that I mentioned from the Kentucky District Court, which she mentions the reasoning of the Posner opinion and says it strains credulity. And I agree with that, obviously. Judge Posner's opinion, first of all, as I believe Chief Justice Carmeier got to, specifically says we're not going to hold, we're not going to reach this because we don't want to conflict with those other U.S. Courts of Appeals, recognizing, when you get back to uniformity, that that's the law of the land insofar as the federal courts are concerned in 20-some states. But he definitely did not reach a holding. When he said in his musings, and I use that term respectfully, and I hope you'll agree when you read his opinion and put it alongside the others, when he talks about, well, the vice whatsoever means anything, he ignores the fact that in the very definition of what is the vice, what's the definition of the vice whatsoever, it's in the statute, one line below. It says, which exempts a railroad from liability. And as I've discussed, this statute doesn't exempt, or the filing of a counterclaim, rather, does not exempt the railroad from liability. Ms. Rosen said they only file it to intimidate and show the rights of employees. We don't know why they filed it, and it's not something that you're supposed to consider, the motive of the railroad. Your question is, can they file it? And if it's inconsistent, if Congress thinks that the end result is inconsistent with the act, then they can do something about it. Judge Posner ignores a justum generis, how you read a law when you have three, which I discussed, when you have three specific terms in a sentence, followed by a general. The general has to be read along with the specifics of the same kind. That's what the word means, of the same kind. So when I read that provision, contracts, rules, regulations, or similar devices, I intentionally inserted the word similar because that's what you're supposed to do when you read a sentence like that. If you go on and read Judge Posner's opinion, there's a lot of reasons that he comes to this conclusion. And have a drink when you're reading it. He says, you have to keep in mind that in 1908, congressional staffs weren't so good. Now, that's an important thing to consider when you're trying to read those words. He says, in those days, the only cases were wage cases. It never explains what, in other words, the only time an employee would sue, because there were so many prohibitions on suing for injuries, the only time they had sues they could sue was in wage cases. I don't know how that fits in. He says, the omission of counterclaim may have been based on Congress's understanding in 1908 of what courts are going to do in the future. He also says, a counterclaim for property damage is just like a contract. So it fits into that language. Now, we didn't spend a lot of time discussing his opinion because I don't think it gets to the point that deals with your responsibility. Your responsibility is to read those words, see what they determine, and reading those few words, did Congress intend to preempt all state law that would otherwise allow a counterclaim for property damage? That's the issue in this case. The motives have nothing to do with the resolution of that case. The question isn't, why did they do it? The question is, can they do it? And with that, I respectfully thank you for your time. And unless there's a question, I'm going to leave it. Thank you. Thank you. Case number 124454, Ammons v. Canadian National, Wisconsin Central. And I'll take another advisement as an agenda, number 12. Mr. Ford, Ms. Rosen, we thank you for your arguments and keeping them light at times. It was enjoyable. You're excused with our thanks.